## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **DR. ROSEMARY ADMIRAL** and **DR. BEN WRIGHT**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **UNIVERSITY OF TEXAS AT DALLAS**; **UNIVERSITY OF TEXAS SYSTEM**; **DR. RICHARD BENSON**, in his individual capacity; **DR. PRABHAS V. MOGHE**, in his official capacity as President of the University of Texas at Dallas; **ATTORNEY GENERAL KEN PAXTON**, in his official capacity; and **GOVERNOR GREG ABBOTT**, in his official capacity, <br><br> *Defendants*. | Case No.: 25-2843 <br><br><br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs Rosemary Admiral and Ben Wright, through counsel, bring this Complaint against the University of Texas at Dallas, University of Texas System, Dr. Richard Benson, Dr. Prabhas V. Moghe, Attorney General Ken Paxton and Texas Governor Greg Abbott.

## I.    INTRODUCTION

1. University of Texas at Dallas ("UTD") Professors Rosemary Admiral and Ben Wright endured violations of their constitutional and contractual rights due to the actions of the Defendants, which include religious and associated ancestry discrimination, retaliatory discipline, and unlawful arrest in response to their constitutionally protected speech and association with a peaceful student-led protest in solidarity with the people of Gaza.

2. Defendants violated Plaintiffs' rights under the First and Fourth Amendments to the United

1

States Constitution, Title VI of the Civil Rights Act of 1964, and 42 U.S.C. § 1981, as enforced through 42 U.S.C. § 1983.

3. On May 1, 2024, UTD students, alumni and community members established a peaceful encampment at Chess Plaza.

4. This protest occurred to demand that the University divest from weapons manufacturers supplying the Israeli military, endorse an immediate ceasefire, and reject Texas Governor Greg Abbott's unconstitutional Executive Order GA-44, which selectively punishes Palestinian-based student advocacy.

5. Professor Wright, a historian of American protest traditions, supported the students by delivering materials and facilitating a read-in.

6. Professor Admiral, a Muslim faculty member, stood with the students in defense of their exercise of their rights to free speech.

7. Rather than protect its community's rights to association, free expression and assembly, Defendants escalated the situation by calling in armed law enforcement officers from multiple agencies.

8. The law enforcement officers called to campus at the request of Defendants descended on the encampment in riot gear.

9. Despite the absence of violence, disruption, or any threat to safety in the protest itself, officers stormed the plaza.

10. Students and faculty chanted, "There is no riot here, why are you in riot gear?"

11. Professors Admiral and Wright attempted to de-escalate the situation and shield students from harm. Instead, law enforcement officials arrested them as well as nineteen other individuals.

12. Law enforcement next transported Plaintiffs and others to Collin County jail, despite the events occurring in Dallas County.

13. Once there, they remained shackled and were subjected to intimidation at gunpoint and exposed to degrading treatment.

14. The arrests came about due to Plaintiffs' and the students' expressions of free speech and perceived association with Palestinians and pro-Palestinian speech.

15. In the weeks following the arrests, Defendants compounded the harm to Plaintiffs by initially banning Plaintiffs from campus without due process or justification, then denying them access to their offices and forcing them to conduct work remotely under arbitrary and shifting restrictions.

16. Law enforcement waited just short of a full year before ultimately not pursuing charges against Plaintiffs Admiral and Wright any further.

17. The University nonetheless imposed its own punishments on Plaintiffs, singling them out and restricting their access to campus in the months following their arrests.

18. Upon information and belief, Defendants took these actions because of Plaintiffs' identity, protected advocacy, and/or perceived association with Palestinian students and causes.

19. Defendants subjected Plaintiffs to viewpoint-based discrimination, selective enforcement of University rules, and unlawful retaliation.

20. Plaintiffs' arrests and subsequent discipline caused lasting reputational, professional, and emotional harm.

21. The discriminatory treatment Plaintiffs endured violated their clearly established rights.

22. Upon information and belief, Defendants took their actions due to discriminatory animus toward Arab, Muslim, and Palestinian and allied communities

23. Defendants' conduct occurred as part of a broader campaign to suppress speech in support of Palestinian rights and chill unwanted free speech on campus.

24. By targeting these faculty members for disproportionate punishment following a peaceful protest, Defendants discriminated against Plaintiffs on the basis of their protected traits, political expression, free speech and association with a group not favored by Defendants.

25. Defendants' actions violate the First and Fourth Amendments, Title VI of the Civil Rights Act, and 42 U.S.C. § 1981.

26. This lawsuit seeks declaratory and injunctive relief to remove unlawful restrictions imposed on Plaintiffs and change policies to prevent similar harm in the future, as well as compensatory and punitive damages for violations of Plaintiffs' constitutional and statutory rights.

27. Plaintiffs also seek attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## II.    THE PARTIES

28. Plaintiff Dr. Ben Wright is a tenured Associate Professor of History at UTD, where he has taught since 2015. At all relevant times, Professor Wright acted within the scope of his employment and engaged in peaceful, constitutionally protected conduct and association. He experienced targeting, arrest, and retaliatory treatment based on his views and association with students advocating for Palestinian rights. He brings this action to redress violations of his constitutional and statutory rights.

29. Plaintiff Dr. Rosemary Admiral is a tenure track Assistant Professor of History at UTD, where she has taught since 2018. Professor Admiral is visibly Muslim. At all relevant times, Professor Admiral acted within the scope of her employment and engaged in peaceful expressive conduct and association. She experienced targeting, arrest, and

retaliatory treatment based on her religion, views, and association with students advocating for Palestinian rights. She brings this action to redress violations of her constitutional and statutory rights.

30. Defendant UTD is a public institution of higher education and a component of the University of Texas System. UTD receives federal financial assistance and is therefore subject to the requirements of Title VI of the Civil Rights Act of 1964. At all relevant times, UTD acted under color of state law or apparent color of law.

31. Defendant Dr. Richard Benson was the President of the University of Texas at Dallas at the time of the events described in this lawsuit. He is sued in his individual capacity for damages. Defendant Benson authorized, condoned, or failed to prevent the unlawful arrest and punishment of Plaintiffs and other community members in connection with the May 1 protest, interfered with Plaintiffs' contractual rights in violation of the law and made false public statements about Plaintiffs designed to interfere with their employment status and professional reputations.

32. Defendant Dr. Prabhas V. Moghe is the President of the University of Texas at Dallas. He is sued in his official capacity. Defendant Moghe authorized, condoned and/or ratified the unlawful conduct toward Plaintiffs following the May 1, 2024 protest, and interfered with Plaintiffs' contractual rights in violation of the law.

33. Defendant University of Texas System ("UT System") is a state university system established under the laws of Texas. It oversees UTD and other component institutions, promulgates policies governing campus conduct, and provides central administrative direction. The UT System receives federal financial assistance and is subject to the requirements of Title VI of the Civil Rights Act of 1964. At all relevant times, the UT

System acted under color of state law.

34. Defendant Ken Paxton is the Attorney General of the State of Texas. As Attorney General, Paxton is the chief legal officer of the state and charged with enforcing state law, issuing binding legal opinions, and defending state entities in litigation. He directed and endorsed measures to suppress pro-Palestinian speech and association on Texas campuses, including UTD. He is sued in his official capacity for declaratory and injunctive relief.

35. Defendant Greg Abbott is the Governor of the State of Texas. As Governor, Defendant Abbott is the chief executive officer of the state and exercises supervisory authority over state agencies and institutions, including the UT System and its component campuses. He publicly called for and directed punitive measures against students, faculty, and community members engaged in pro-Palestinian speech and protest. He is sued in his official capacity for declaratory and injunctive relief.

### III.    JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the First and Fourth Amendments to the United States Constitution and Title VI of the Civil Rights Act of 1964.

37. This Court also has jurisdiction under 28 U.S.C. § 1343 because the action seeks to address the deprivation of civil rights protected by 42 U.S.C. § 1981 via 42 U.S.C. § 1983.

38. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events that give rise to this action occurred in this district.

### IV.    STATEMENT OF FACTS

#### A. *Events Leading Up to the May 1, 2024 Protest*

39. In March 2024, Governor Greg Abbott issued an Executive Order specifically targeting

two pro-Palestinian student groups and calling for disciplinary actions specifically against members or affiliates of those two student groups.

40. The March 2024 Executive Order by Governor Abbott contradicts his previous 2019 signing of a statute he promoted through the legislature, which guaranteed First Amendment free speech rights on campuses in Texas.

41. In a video promoting and showing his signing of the 2019 statute, Defendant Abbott stated that "It's in the Constitution. This shouldn't be necessary. Now, it's law in Texas."

42. The March 2024 Executive Order contradicts the 2019 statute by limiting the locations and manner in which only students affiliated with pro-Palestinian student groups may exercise their rights to free expression under both the Constitution and the 2019 statute.

43. In the months preceding May 1, 2024, students and professors at UTD increasingly came under scrutiny and harassment for any support of Palestinian rights and participation in peaceful campus demonstrations.

44. What began as protected political expression became a show of disproportionate censorship and escalating hostility from university administrators.

45. In November 2023, UTD removed the "Spirit Rocks," a longstanding platform for student speech, after students painted pro-Palestinian and anti-Zionist messages on them.

46. UTD personnel previously allowed other forms of expression on the Spirit Rocks, including by Jewish and pro-Israel students.

47. Dean of Students Amanda Smith labeled the pro-Palestinian messages "hate speech."

48. University officials removed the rocks entirely, eliminating the physical space for expression of dissenting viewpoints.

49. In spring 2024, students held a peaceful sit-in outside administrative offices.

50. UTD initially claimed the demonstration posed a fire hazard.

51. The local Fire Marshal personally inspected the scene and found no violations, and allowed students to remain as long as exits remained clear.

52. On May 1, 2024, students organized a "Gaza Liberation" encampment at Chess Plaza, a space set apart from classrooms and daily campus activity.

53. The students issued three peaceful demands: that UTD divest from weapons manufacturers supporting the Israeli military; support a permanent ceasefire in Gaza; and reject Texas Governor Greg Abbott's Executive Order GA-44, which punishes pro-Palestinian student groups under the guise of combating antisemitism.

54. The encampment was peaceful, well-organized, and rooted in a deep commitment to nonviolence.

55. Students supplied water and food, established teams of legal observers and medics, and created encampment guidelines that prohibited bigotry or vandalism.

56. Students maintained open walkways to avoid blocking student traffic.

57. Professor Wright visited the encampment to deliver materials and conducted a read-in, sharing information on past movements for justice and reminding students that change is always met with resistance but that they should maintain their commitment to non-violent protests.

58. Professor Wright later observed how seriously the students took their responsibilities, recalling that they discussed in advance how they would respond if the Fire Marshal arrived.

59. He described the encampment as filled with "calm responsibility," with students policing their own behavior to avoid any conflict and ensuring that participation remained respectful

and safe.

60. Professor Wright held a peaceful, silent read-in at 10:00 a.m. with students that day.[1]

61. To verify whether the encampment posed an inconvenience or impeded pathways, Professor Wright and a colleague timed the alternate walking route around Chess Plaza.

62. Professor Wright and his colleague determined the alternate route added less than 30 seconds.

63. The Fire Marshal confirmed that the encampment posed no safety risk.

64. UTD canceled no classes.

65. UTD identified no disruptions prior to the arrival of law enforcement, through its internal alert systems or otherwise.

66. Professor Admiral is a tenure track Assistant Professor of History at UTD. On May 1, 2024, she returned to campus from Morocco where she conducted research on a Fulbright fellowship.

67. On May 1, 2024, she saw on social media that students set up an encampment at Chess Plaza. Around 2:00 p.m., she walked to the site with books and materials for her students.

68. She recognized several students she had taught, and joined in a mid-day prayer.

69. She took note of the peaceful atmosphere and organized structure of the encampment.

70. Later that day, she learned police had begun assembling near the encampment.

71. Concerned for their students, Professors Admiral and Wright returned to Chess Plaza.

72. Professor Admiral discussed what was happening with UTD employees and leaders present at the encampment and witnessed administrators speaking with student protest leaders.

---

[1] "*From a Read-In to Arrests: Inside the Pro-Palestine Encampment at UT Dallas*," D Magazine, Steven Monacelli (May 2, 2024), *located at* https://www.dmagazine.com/frontburner/2024/05/from-a-read-in-to-arrests-inside-the-pro-palestine-encampment-at-ut-dallas/

73. She saw police advancing toward the encampment and walked to the front, along with Professor Wright.

74. Professors Admiral and Wright focused on peaceful, supportive actions to protect their students.

**B.  The May 1 Arrests**

75. At approximately 1:00 p.m. on May 1, University officials affirmed their support for free speech at an Academic Council meeting.

76. Yet by 2:40 p.m., students noticed state troopers and militarized law enforcement assembling on campus.

77. At 3:30 p.m., while in his office, Professor Wright received messages from students expressing concern about the police buildup.

78. Professor Wright rushed to Chess Plaza out of concern for his students' safety.

79. When he arrived, he overheard one volunteer community member read from a notice issued by UTD administration.

80. The notice did not, in his hearing, articulate a clear message or clear instructions.

81. University officials failed to make sufficient copies of the notice available.

82. Fifteen minutes later, troopers lined up in military formation.

83. Dean Smith gave a limited number of paper notices (not nearly enough for all 100 participants) to one non-attorney student at the encampment, that threatened students participating in the encampment with expulsion and criminal consequences.

84. Multiple people present asked to see the paper notices, but could not as Dean Smith neither distributed the notice sufficiently nor made any effort to speak to those present.

85. Professors Admiral and Wright neither received a written copy of the notice nor read or

heard the full notice.

86. Upon information and belief, Defendants brought in law enforcement officers from at least five different departments to campus, including a SWAT team.

87. Neither Dean Smith nor any other administrators offered students any dialogue or discussion.

88. Neither University officials nor law enforcement attempted a peaceful resolution.

89. Neither University officials nor law enforcement issued any clear disbursement order, prior to arrests beginning.

90. Professor Wright stood between the officers and students, hoping to de-escalate what he viewed as an "absurd, dangerous overreaction."

91. Instead, he became one of the first arrested.

92. Officers, including the University police onsite, never read or presented any messages to disperse to the students.

93. Officers, including the University police onsite, gave no verbal commands to those present at the encampment.

94. Instead, officers stormed the encampment in coordinated waves.

95. Officers arrested students, professors, and community members with overwhelming, unnecessary and disproportionate force.

96. Professor Wright described looking into the eyes of his students—young, frightened, and seeking guidance—while law enforcement officers in riot gear advanced toward them.

97. Professor Wright also observed a young child who was present, approximately five years old, who had been playing during the peaceful protest before law enforcement officers advanced.

98. Families, students and others present soon appeared visibly scared by the approach of the law enforcement officers.





*Prof. Wright conducts a peaceful read-in.*

*Professors Admiral and Wright stand peacefully, faced with a long line of officers.*

99. Officers arrested Professor Wright without warning, and shackled his wrists, waist, and legs.

100. Professor Wright complied with all instructions given by law enforcement officers; officers nonetheless arrested him anyway.



101. Officers then threw Professor Wright into a hot, unventilated transport van alongside arrested students and a fellow faculty member.

102. Despite the presence of seatbelts in the transport, officers did not secure Professor Wright or those with him.

103. Because law enforcement officials left them shackled during transport, Professor Wright and the others in the transport could not secure themselves with the seatbelts.

104. The failure of law enforcement to safely secure those shackled in the transport, including Professor Wright, caused a dangerous situation and resulted in multiple instances where the occupants slammed into each other because of the force of the ride and their unsecured status.

105. Officers also arrested Professor Admiral, who stood between students and officers to protect the students and reassure them.



*Professor Admiral stands facing a long line of officers and tried to communicate with them, but was arrested shortly after the time of this photograph.*

106. Officers also shackled Professor Admiral.

107. Professor Admiral complied with all instructions given by law enforcement officers; officers nonetheless arrested her anyway.

108. Plaintiffs and their arrested colleagues endured unjust treatment including threats.

109. Professor Wright spent over 20 hours in Collin County jail, detained with 20 other students and community members also arrested while peacefully protesting.

110. Professor Admiral spent approximately 22 hours in Collin County jail.

111. Despite the protest occurring in Dallas County, Defendants coordinated with law enforcement for all arrestees to be transported to Collin County jail.

112. Collin County jail has a reputation for harsher conditions than Dallas County facilities.[2]

113. Collin County is generally a more conservative county than Dallas County overall, and Governor Abbott has wider support in Collin County than in Dallas County.

114. The Sheriff's office in Collin County previously accepted an invitation from the Israeli national defense force ("IDF") and the Anti-Defamation League, as well as other private entities, to participate in "counterterrorism" training in Israel.

115. The Sheriff's office personnel who attended this trip included the night duty nurse.

116. The Sheriff publicly described the trip as "an extraordinary experience" that took place over four days.

117. The Sheriff also described receiving "high level" briefings from the IDF.

118. The Sheriff repeated now-debunked general allegations of violence attributed to the events of October 7, 2023.

119. The Sheriff also watched a propaganda film created by the IDF.

---

[2] *Ghastly Things Happen at the Collin County Jail*, Dallas Morning News (June 17, 2021), https://www.dallasnews.com/opinion/editorials/2021/06/17/ghastly-things-happen-at-the-collin-county-jail/

120. Upon arrival at the jail, officers pointed machine guns at detainees, screamed at them to face the wall, and warned them not to move.

121. Professor Wright described the experience as one of extreme psychological intimidation.

122. In jail, officers denied Muslim students prayer accommodations and halal food despite their repeated requests.

122. Officers verbally harassed arrestees, particularly over requests and attempts to pray.

123. Officers in the lobby area concealed their identities with ski masks and took unnecessary threatening actions toward those arrested, despite no reports of any of the arrestees showing aggression.

124. Officers originally had been in uniform with name badges, then left and returned in all black combat gear with no identification or name badges visible.

125. During processing, officials advised the arrestees that they should not mention any mental health issues or other concerns, or they would face further negative consequences.

126. Collin County booking records falsely booked female arrestees as "White" even for several who are not, and male arrestees as "Middle Eastern" even for several who are not.

127. Upon information and belief, Defendants did this based on appearance and assumption, further underscoring the racial focus of the arrests.

128. Despite their circumstances, Professor Wright recalled that the arrested students remained calm.

129. The arrestees discussed studies and passions, drawing strength from each other.

130. They assured themselves that what they endured was nothing compared to the suffering of the people of Gaza.

131. They exchanged ideas with fellow inmates, offered reading recommendations, and

discussed the U.S. prison system—turning their detention into an unexpected extension of their commitment to learning and justice.

### C. Retaliation Against Faculty

132. After their release, UTD officials subjected Professors Admiral and Wright to ongoing adverse conditions, retaliation and disparate treatment in violation of their contractual provisions.

133. UTD initially barred both professors from campus, even though their bond conditions allowed them to return to work, without first obtaining prior written approval from the administration.

134. Professor Admiral's supervisor called her as soon as she was released from Collin County jail and informed her she was barred from returning to campus.

135. Professor Admiral later received notice that she could appear on campus, but only for limited circumstances, in limited places and/or at limited times.

136. UTD officials never fully articulated the degree of these limitations.

137. The conditions imposed required Professor Admiral to teach remotely, despite the fact that she presented no threat to the community.

138. UTD officials informed Professor Admiral that if she wanted to retrieve her personal belongings, the same law enforcement officers who arrested her would escort her while on campus.

139. This condition created a clear and reasonable fear of re-arrest, and reasonably perceived threat of further punishment.

140. No court imposed the extent of these restrictions on Plaintiffs Admiral and Wright.

141. Professor Admiral's bond document only shows her conditions in Wingding or other illegible font.



142. Professor Admiral later obtained a legible copy, which describes that she "may not go on the UT Dallas campus except for the purpose of teaching classes or employment/research related activities."



143. UTD chose to impose unreasonable restrictions on Professors Admiral and Wright.

17

144. Nine of the arrested students received referrals for disciplinary proceedings.

145. The University did not take any action against the many others who also participated in the protest, or as counter-protestors, but were not arrested.

146. The arrests and discipline targeted the most visible and vulnerable: Muslims, Palestinians, and their allies.

147. The University also canceled Professor Admiral's Study Abroad program for the upcoming year following her arrest, without sufficient justification.

148. Upon information and belief, the University gave conflicting reasons for that cancellation.

149. University officials cited to Professor Admiral that the reason for the cancellation derived from their belief that Professor Admiral needed to work on her tenure and publication-related tasks.

150. Upon information and belief, University officials told others that the University canceled the Study Abroad program because Professor Admiral had not completed her third year review, a required step for gaining tenure.

151. Professor Admiral submitted her file for her third year review in 2020, receiving confirmation from University officials in 2021 that she successfully completed that step.

152. Professor Admiral suffered direct financial as well as reputational harm due to the cancellation of the Study Abroad program after her arrest.

### D. *Viewpoint-Based Motivation*

153. UTD previously permitted other student groups—including fraternities—to erect tents and displays without interference.

154. UTD singled out pro-Palestinian advocacy for disproportionate response including riot police, criminal charges, and academic consequences.

18

155. UTD's retaliation extends beyond the protest itself.

156. The student newspaper *The Mercury* faced censorship, staff purges, and punitive measures after it reported accurately on the encampment, the arrests and its aftermath.

157. The student paper published articles and editorials highlighting the peaceful nature of the protest and the university's crackdown, including headlines such as "There is no riot here! Why are you in riot gear?" and "Hiding in Plain Sight."

158. After *The Mercury*'s Editor-in-Chief refused to submit articles for administrative pre-approval, UTD terminated him from his position without due process.

159. UTD administration also fired staff who went on strike in protest, denied pay to some, and barred staff from speaking with student media.

160. UTD administrators imposed a new policy requiring prior review of all content before publication in the student paper—an unconstitutional restriction that violated press freedom and student speech rights.

161. Faculty and administrators associated with the retaliation publicly referred to student journalists as "antisemitic" and "unprofessional."

162. The crackdown did not occur due to conduct—it occurred to stifle viewpoints.

163. UTD officials targeted professors and students for their advocacy on behalf of Palestinians.

164. UTD officials punished individuals who engaged in protected speech, silenced those who defended them, and cultivated an atmosphere of fear and censorship that persists today.

### E. University's Unlawful Response

165. Despite widespread support for the arrested professors and students—including petitions signed by over 1,500 alumni, faculty, and students—Defendants' representatives persisted

in presuming the guilt of Plaintiffs and others, and did not afford them proper due process.

166. Then-President Richard Benson publicly claimed he did not know whether the arrestees were armed or had criminal records.

167. Upon information and belief, at the time he made that statement, former President Benson had immediate access to and knowledge of information that showed those arrested were not armed.

168. Upon information and belief, at the time he made that statement, former President Benson had immediate access to and awareness of information that showed most, if not all, of those arrested had no criminal records.

169. During a July meeting with Texas State Representative Ana-Maria Ramos, Dean Amanda Smith rejected appeals for compassion and asked instead whether she should also show leniency to "rapists."

170. Upon information and belief, her remarks reflect deep bias and an unwillingness to distinguish between peaceful protest and violent crimes.

171. Defendants further undermined Plaintiffs, and failed to follow their own procedures.

172. Dean Smith unilaterally replaced the standard student disciplinary committee—a mix of faculty, staff, and students—with a panel of three hand-picked outside attorneys.

173. Dean Smith took this action without community input.

174. Upon information and belief, UTD officials including Dean Smith took this action in hopes of securing harsher outcomes.

175. Even this handpicked panel declined to impose the University's recommended punishments of deferred suspension and degree withholding on the relevant students, and issued written warnings instead.

## V.   <u>CLAIMS FOR RELIEF</u>

### <u>CLAIM FOR RELIEF NO. 1: 42 U.S.C. § 1981</u>

176. Plaintiffs incorporate by reference all preceding paragraphs in this Complaint and the allegations contained therein.

177. Plaintiffs Professor Ben Wright and Professor Rosemary Admiral bring claims pursuant to 42 U.S.C. § 1981, as enforced through 42 U.S.C. § 1983.

178. Section 1981 guarantees all persons within the United States the same right to make and enforce contracts, to the full and equal benefit of all laws as is enjoyed by white citizens. This protection includes the terms, conditions, and privileges of employment in public institutions.

179. As public university professors, Plaintiffs have contractual relationships with the University of Texas at Dallas ("UTD").

180. Plaintiffs have the right to participate in those contracts, free from racial, ethnic, and religious discrimination or associational discrimination in their employment.

181. Professors Wright and Admiral endured discriminatory treatment by UTD because of their actual or perceived affiliations and association with Palestinians, Arabs, Muslims, and pro-Palestinian advocacy.

182. Professor Admiral is visibly Muslim.

183. Professor Admiral had not previously been outspoken in public on her beliefs.

184. Professor Admiral had previously been advised to keep her head down and not speak about Palestine until after she receives tenure.

185. Professor Admiral's identity and religion made her a target of heightened surveillance and retaliation by UTD officials.

186. Both Plaintiffs participated in constitutionally protected activity related to the peaceful campus protest on May 1, 2024.

187. Defendants caused the arrest of both Plaintiffs unjustly.

188. Defendants further excluded Plaintiffs from campus, denied then continued to restrict their access to their offices and workspaces, and subjected them to reputational harm, despite posing no threat and remaining in good standing with the University.

189. Defendants took these adverse actions against Plaintiffs because of their association and perceived alignment with a racial and religious group disfavored by Defendants, and due to Plaintiffs' support for students associated with that group.

190. Other similarly situated faculty members did not endure comparable treatment or restrictions for comparable conduct.

191. Defendants' differential treatment of Plaintiffs occurred, upon information and belief, due to intentional racially and religiously motivations that interfered with their contractual employment rights, in violation of § 1981.

192. Defendants acted under color of state law and apparent color of law and are liable via § 1983 for violating Plaintiffs' rights under § 1981.

193. As a result of Defendants' actions, Plaintiffs suffered loss of professional opportunities, reputational damage, emotional distress, and other compensable harms.

194. Upon information and belief, Defendants Abbott and Paxton actively participated in or ratified the conduct described above.

## CLAIM FOR RELIEF NO. 2: Title VI of the Civil Rights Act of 1964

195. Plaintiffs incorporate by reference all preceding paragraphs in this Complaint and the allegations contained therein.

196. UTD receives federal financial assistance and therefore must follow the requirements of Title VI of the Civil Rights Act of 1964.

197. Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal funds.

198. The scope of Title VI includes discrimination based on shared ancestry and shared heritage.

199. The United States Supreme Court has long held that religious identify falls within the protections of Title VI.

200. Plaintiffs Professors Wright and Admiral endured adverse actions by UTD and at the direction of and due to the actions of Defendants, based on their perceived identity as, and association with, Palestinian, Arab, and Muslim individuals.

201. Professor Admiral is visibly Muslim and experienced heightened scrutiny and punitive treatment by Defendants as a result.

202. Both Plaintiffs were unjustly arrested, initially banned and later restricted from campus by Defendants, and restricted from fulfilling their professional duties.

203. These adverse actions did not occur as a result of any violations of legitimate, previously articulated policies or as a result of any objectively legitimate security threats.

204. Upon information and belief, Defendants' actions occurred because Plaintiffs stood in solidarity with students advocating for Palestinian rights.

205. Defendants' treatment of Plaintiffs differed starkly from its treatment of similarly situated faculty or students who expressed other viewpoints.

206. UTD administrators had previously allowed student organizations, including fraternities, to erect tents and displays without interference.

207. UTD officials only responded to those advocating for Palestinians by calling multiple law

enforcement agencies to respond with militarized police, mass arrests, and later the University's own discipline purportedly based on these arrests.

208. Upon information and belief, UTD's enforcement decisions resulted from racially and religiously based animus and viewpoint discrimination.

209. Plaintiffs are qualified for their academic positions and carried out their duties with excellence at all relevant times, as documented in their performance reviews given by University officials.

210. Plaintiffs endured these actions by Defendants as a result of their affiliation with, association with and support for Palestinian, Arab, Muslim and allied individuals.

211. This conduct by Defendants and their representatives constitutes unlawful disparate treatment and violates the protections guaranteed under Title VI.

## CLAIM FOR RELIEF NO. 3: Fourth Amendment – Unlawful Arrest

212. Plaintiffs incorporate by reference all preceding paragraphs in this Complaint and the allegations contained therein.

213. The Fourth Amendment protects individuals from unreasonable seizures.

214. Defendants caused or took steps to cause the arrests of Professors Wright and Admiral while they engaged in peaceful constitutionally protected conduct, at their place of employment.

215. No individualized probable cause existed to justify Plaintiffs' arrests.

216. Upon information and belief, Defendants' seizure of Plaintiffs occurred in retaliation for their support of a peaceful protest and their status as, and association with, those advocating for Palestine.

217. Defendants caused Plaintiffs to be shackled.

218.  Defendants caused Plaintiffs to endure transport in dangerous conditions.

219.  Defendants caused Plaintiffs to endure transport to Collin County jail, despite all relevant events occurring within Dallas County.

220.  Defendants caused the sequence of events that led to Plaintiffs enduring intimidation and degrading treatment.

221.  Upon information and belief, Defendants orchestrated and/or caused Plaintiffs' arrests, in collaboration with local and state law enforcement.

222.  Defendants' actions constituted an unlawful seizure under the Fourth Amendment.

223.  Plaintiffs suffered emotional distress, reputational harm, and physical and psychological injury as a result of Defendants' actions and misrepresentations.

**CLAIM FOR RELIEF NO. 4: Violation of the First Amendment**

224.  Plaintiffs incorporate by reference all preceding paragraphs in this Complaint and the allegations contained therein.

225.  Plaintiffs Professors Ben Wright and Rosemary Admiral engaged in constitutionally protected speech and expressive conduct.

226.  Plaintiffs participated in and supported the peaceful student-led encampment on May 1, 2024.

227.  The event on May 1, 2024 involved peaceful advocacy for Palestinian human rights and divestment from weapons manufacturers supplying the Israeli military.

228.  Both professors acted in their individual capacities as educators committed to democratic engagement, not as official university spokespersons.

229.  Defendants retaliated against Plaintiffs for expressing views that conflicted with the administration's position and political preferences.

230. Upon information and belief, Defendants authorized law enforcement to arrest Plaintiffs without probable cause.

231. Professors Wright and Admiral endured arrest while attempting to de-escalate police aggression and shield students from harm.

232. The arrest and subsequent treatment Plaintiffs endured as a result of Defendants' actions, including shackling and degrading detention, were unjustified and unlawful.

233. After Plaintiffs' release, Defendants imposed punitive restrictions including campus bans, restrictions, denial of access to offices and resources, and requirements for police escort.

234. The restrictions imposed on Plaintiffs by Defendants did not come from any court orders and lacked any legitimate academic or administrative basis.

235. Professor Admiral, a Muslim woman, taught remotely, because she felt unsafe returning to the hostile and discriminatory environment.

236. Defendants' actions occurred under color of state law and violated clearly established First Amendment rights.

237. Plaintiffs suffered reputational and professional harm, emotional distress, and a chilling of their academic and political expression as a result of Defendants' actions.

### CLAIM FOR RELIEF NO. 5: First Amendment Retaliation

238. Plaintiffs incorporate by reference all preceding paragraphs in this Complaint and the allegations contained therein.

239. Professors Wright and Admiral exercised their First Amendment rights to engage in peaceful free expression, and association and support of students' free speech expressions.

240. Plaintiff Wright participated in a read-in and facilitated dialogue.

241. Plaintiff Admiral provided materials to students and facilitated dialogue.

242. Plaintiffs attempted to de-escalate the situation caused by Defendants.

243. Following their arrests, Plaintiffs became the targets of retaliatory measures by Defendants not applied to other faculty.

244. These retaliatory actions include campus bans, restricted access to offices and teaching facilities necessary for the terms and conditions of Plaintiffs' employment and not mandated by any governing court order, and threats of further discipline.

245. The protests, prior to the arrival of law enforcement, did not disrupt University operations.

246. The protests, prior to the arrival of law enforcement, posed no threat to safety of University officials or other students.

247. Defendants' actions lack any articulated legitimate justification.

248. Upon information and belief, Defendants took their actions in direct response to Plaintiffs' protected status and activities.

249. Defendants' actions and retaliatory measures would reasonably deter a person of ordinary firmness and character from continuing to engage in protected expression.

250. Plaintiffs suffered reputational damage, emotional distress, and harm to their academic careers as a result of Defendants' actions.

251. Defendants' actions violate clearly established First Amendment protections, giving rise to this action under § 1983.

## VI.    <u>JOINT AND SEVERAL LIABILITY</u>

252. All Defendants are jointly and severally liable for any damages assessed herein.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs Professor Ben Wright and Professor Rosemary Admiral respectfully request this Court enter judgment in their favor and grant the following relief:

A.  Grant declaratory judgment that the actions and omissions of Defendants, as described in this Complaint, violate the rights of Plaintiffs and others similarly situated as them.

B.  Declare that Defendants violated Plaintiffs' rights under the First and Fourth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, and 42 U.S.C. § 1983;

C.  Grant a permanent injunction prohibiting Defendants from enforcing retaliatory or discriminatory restrictions on Plaintiffs' access to campus, academic duties, or professional activities on the basis of their protected speech, religion, race, or association;

D.  Order that Defendants reverse any and all disciplinary measures, exclusions from campus, or restrictions imposed on Plaintiffs as a result of their peaceful participation in the May 1, 2024 protest;

E.  Award compensatory damages in an amount to be determined at trial for the emotional distress, reputational harm, professional disruption, and other injuries caused by Defendants' unlawful conduct;

F.  Award punitive damages against Defendant Benson in his personal capacity, in an amount sufficient to punish and deter willful and reckless violations of Plaintiffs' constitutional and statutory rights;

G.  Order that Defendants cease any and all ongoing or future discriminatory or other actions in violation of the law as set forth in the preceding Paragraphs of this Complaint and incorporated herein by reference;

H.  Award Plaintiffs reasonable attorneys' fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988 and any other applicable law; and

I.  For such other and further relief as the Court deems just, equitable, and proper.

Respectfully submitted this 20th day of October, 2025.

Respectfully submitted,

*/s/ Christina Jump*
Christina A. Jump, TX Bar No. 00795828
Chelsea Glover, TX Bar No. 24097738
Jinan Chehade, D.C. Cir. ID No. 65511
*(admission to N.D. Tex. pending)*
Legal Division of Muslim Legal Fund of America
100 North Central Expy, Ste. 1010
Richardson, TX 75080
Tel: (972) 914-2507
Fax: (972) 692-7454
cjump@clcma.org
cglover@clcma.org
jinan.chehade@mlfa.org